IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT TAYLOR,<br><br>               Plaintiff,<br><br>   v.<br><br>THE COMMONWEALTH OF<br>PENNSYLVANIA, et al.,<br><br>             Defendants. | CIVIL ACTION<br>NO. 17-3369 |

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION ................................................................................................. 4

II. BACKGROUND ................................................................................................. 5

III. STANDARD OF REVIEW ................................................................................ 10

IV. ANALYSIS ........................................................................................................ 11

    A. All Claims Against the Curran-Fromhold Correctional Facility and the
Philadelphia Sheriff's Office Will Be Dismissed ....................................................... 12

    B. Plaintiff Fails to State a <u>Monell</u> Claim Against the City of Philadelphia ................. 13

        1. Plaintiff Fails to Plead a <u>Monell</u> Claim Regarding the Events of His
November 15, 2016 Arrest ..................................................................................... 16

            a. Plaintiff's Allegations Regarding His Arrest, Imprisonment, and the Search
and Seizure Do Not Establish a Fourth Amendment Violation ......................... 16

            b. Plaintiff Does Not Link His Arrest, Imprisonment, or Search and Seizure
Injury to a Policy, Custom, or Deliberate Indifference by a
Municipal Policymaker ................................................................................... 18

        2. Plaintiff Fails to State a <u>Monell</u> Claim With Respect to Mail Tampering and
Denial of Access to the Court at the CFCF ........................................................... 18

            a. Plaintiff's Allegations Regarding Mail Tampering and Denial of Access to
the Court Do Not Establish a Fourteenth Amendment Violation ...................... 19

   b. Plaintiff Does Not Link His Mail Tampering or Access to the Courts Injury to a Policy, Custom, or Deliberate Indifference by a Municipal Policymaker ...................................................................................... 20

3. Plaintiff Fails to State a <u>Monell</u> Claim With Respect to Overcrowding and Conditions of Confinement ...................................................................... 21

   a. Plaintiff's Overcrowding and Conditions of Confinement Allegations Establish the First Prong of a <u>Monell</u> Claim ....................................... 21

      i. Plaintiff's Claims Regarding Triple-Celling at the CFCF Sufficiently Establish the First Prong of a <u>Monell</u> Claim ................................... 23

      ii. Plaintiff's Claims Regarding Cold Air at the CFCF Sufficiently Establish the First Prong of a <u>Monell</u> Claim ................................... 25

      iii. Plaintiff's Allegations Regarding Strip Searches at the CFCF Do Not Establish a Fourth or Fourteenth Amendment Violation ................. 27

      iv. Plaintiff's Claims Regarding the Pepper Spray Incident at CFCF Do Not Establish a Fourteenth Amendment Violation ................................ 30

   b. Plaintiff Fails to Sufficiently Link His Conditions of Confinement Injuries to a Policy, Custom, of Deliberate Indifference by a Municipal Policymaker ...................................................................................... 33

4. Plaintiff Has Failed to State a <u>Monell</u> Claim With Respect to His Religious Deprivation and Discrimination Allegations .......................................... 35

   a. Plaintiff's Religious Deprivation and Discrimination Claims Sufficiently Establish the First Prong of a <u>Monell</u> Claim ..................................... 35

      i. The Prison's Delay in Delivering Plaintiff His Meals During Periods of Religious Fasting Does Not Violate the First Amendment ......................... 35

      ii. Plaintiff's Claims that the CFCF Prevented Him from Practicing Islam Establish the First Prong of a <u>Monell</u> Claim ................................. 37

   b. Plaintiff Has Failed to Link His Alleged Religious Deprivation and Discrimination Injuries to a Policy, Custom, or Deliberate Indifference by a Municipal Policymaker .......................................................................... 39

5. Plaintiff Has Failed to State a <u>Monell</u> Claim With Respect to His Inadequate Medical Care Allegations .................................................... 41

C.    Plaintiff Fails to State a Claim under § 1983 Against Warden Gerald May ............. 45

D.    Plaintiff Fails to State a Claim under § 1983 Against Officer Obrien ...................... 49

E.    Plaintiff Fails to State a § 1983 Claim Against Sergeant Lebesco ........................... 50

F.      All State Law Claims Will Be Dismissed Pursuant to 28 U.S.C. § 1367 ................. 51

V. CONCLUSION ........................................................................................................... 51

<u>OPINION</u>

**Slomsky, J.**                                                    **December 12, 2018**

## I.    INTRODUCTION

Plaintiff Robert Taylor, proceeding <u>pro se</u>, brings this suit pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights arising from his arrest on November 16, 2015.  (Doc. No. 10.)  Defendants are the Commonwealth of Pennsylvania, the Philadelphia District Attorney's Office, the Philadelphia Criminal Justice Center, the Honorable Frank Palumbo, the City of Philadelphia, unnamed Philadelphia Police Officers, the Philadelphia Department of Prisons, the Curran-Fromhold Correctional Facility ("CFCF"), the Defender Association, Warden Gerald May, the Philadelphia Sheriff's Office, Public Defender Christopher Angelo, Philadelphia Police Officer Obrien,[1] and Sergeant Lebesco, a prison official.[2]    (<u>Id.</u> at 1-2.)

In the first cause of action in the Amended Complaint, Plaintiff alleges violations of his rights under the First, Fourth, Eighth, and Fourteenth Amendments by all Defendants.  (<u>Id.</u> at 10.) In the second cause of action, Plaintiff asserts various state law claims against all Defendants.  (<u>Id.</u> at 11.)   Plaintiff seeks money damages and injunctive relief.

On June 4, 2018, Defendants City of Philadelphia, Officer Obrien, Warden Gerald May, and Sergeant Lebesco filed the present Motion to Dismiss the Amended Complaint for Failure to

---

[1]   Although "Obrien" is traditionally spelled "O'Brien," neither Plaintiff nor Defendants use the latter spelling.

[2]   On May 15, 2018, Defendants Criminal Justice Center and the Honorable Frank Palumbo filed a Motion to Dismiss the Amended Complaint.  (Doc. No. 11.)  In another Order issued this day, the Court will grant Defendants Criminal Justice Center and Judge Palumbo's Motion (Doc. No. 11).  On May 25, 2018, Defendants Defender Association and Assistant Defender Christopher Angelo filed a Motion to Dismiss the Amended Complaint.  (Doc. No. 13.)  In another Order issued this day, the Court will grant Defendants Defender Association and Christopher Angelo's Motion (Doc. No 13).

State a Claim. (Doc. No. 14.) In that same Motion, Defendants asked the Court to dismiss Plaintiff's claims against the Curran-Fromhold Correctional Facility and the Philadelphia Sheriff's Office because they are departments within the City of Philadelphia, and not proper parties to the suit. (Id. at 7.) Plaintiff has not filed a response to Defendants' Motion and has not requested additional time to do so. Nor has he requested the opportunity to further amend the Amended Complaint.

Defendants' Motion is now ripe for decision. For reasons stated below, the Court will grant Defendants' Motion (Doc. No. 14) in its entirety and dismiss Plaintiff's claims against the City of Philadelphia, Officer Obrien, Warden Gerald May, and Sergeant Lebesco.

## II. BACKGROUND

On September 22, 2009, Plaintiff Robert Taylor was arrested in Philadelphia and charged with various offenses involving the possession of a firearm and making false statements to authorities.[3] Commonwealth v. Taylor, Court Summary, No. CP-51-CR-009569-2010 at 5 (Ct. Com. Pl. Philadelphia, filed July 28, 2010). After a trial in the Philadelphia Court of Common Pleas, Plaintiff was found guilty and sentenced to 11 to 23 months' imprisonment, followed by five (5) years of probation. Commonwealth v. Taylor, Docket No. CP-51-CR-009569-2010 at 6-7 (Ct. Com. Pl. Philadelphia, filed July 28, 2010).

On November 16, 2015, Plaintiff was arrested and detained for violating his probation.[4] (Doc. No. 10 at 3.) According to the Amended Complaint, Plaintiff was "unreasonably summoned

---

[3] In evaluating Plaintiff's claims under § 1983, the Court may take judicial notice of matters of public record, including documents that are outside the pleadings. See S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd., 181 F.3d 410, 426 (3d Cir. 1999) ("To resolve a 12(b)(6) motion, a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint.").

[4] In the Amended Complaint, Plaintiff does not allege that he was arrested for violating his probation. Rather, he contends that he "had not violated any laws precipitating this incident

to stop on the sidewalk by members of the Philadelphia police department," including Officer Obrien and another unnamed officer, but he contends that he "had not violated any laws precipitating this incident stop." (Doc. No. 10 at 3.) After the stop, Plaintiff claims that he was "subjected to unreasonable arrest and unreasonable search and seizure." (Id.) After being taken into custody, Plaintiff alleges that the police shuttled him back and forth between two different police stations, all the while keeping him handcuffed in the back seat of the squad car. He claims that he was "detained without charge or due process."[5] (Id.)

The next day, Plaintiff was transported to the Curran-Fromhold Correctional Facility ("CFCF"), where he was detained pending the outcome of his violation of probation hearing. (Id.) According to the Amended Complaint, the Philadelphia Sheriff's Office hauled him back and forth from the CFCF to the Criminal Justice Center ("CJC") every 60 to 90 days, but the Court of Common Pleas did not hold any violation of probation proceedings until July 12, 2017, the day of his ultimate release. (Id. at 4.)

The Honorable Frank Palumbo, a judge in the Philadelphia County Court of Common Pleas Criminal Division, was assigned to preside over Plaintiff's violation of probation proceeding.

---

stop." (Doc. No. 10 at 3.) However, Defendants state that he was arrested for violating his probation. (Doc. No. 14.) The Court will take judicial notice of the public record of Plaintiff's state court proceedings, which shows that he was arrested for a "bench warrant probation violation." Commonwealth v. Taylor, Court Summary No. CP-51-CR-009569-2010 at 5 (Ct. Com. Pl. Philadelphia, filed July 28, 2010); Commonwealth v. Taylor, Docket No. CP-51-CR-009569-2010 at 14 (Ct. Com. Pl. Philadelphia, filed July 28, 2010) (using the term "violation of probation arrest warrant").

[5] Plaintiff contends that no charges were ever filed against him, but a review of the state court record shows that on November 19, 2015, the Philadelphia County Adult Probation Unit filed a Gagnon I Summary in his case. In Philadelphia state court, a Gagnon I Summary is filed prior to a probationer's Gagnon I hearing, which operates as a preliminary hearing for his violation of probation. See Gagnon v. Scarpelli, 411 U.S. 778, 782 (1973). Thus, despite Plaintiff's allegations, the public record shows that he was charged with violating his probation.

Commonwealth v. Taylor, Docket No. CP-51-CR-009569-2010 at 5. Judge Palumbo continued the violation of probation hearing so that Plaintiff could undergo mental health and competency evaluations. Id. at 1-3. This occurred over the course of several hearings. Plaintiff remained incarcerated at the CFCF and the CJC during these proceedings. He claims that while at the CJC, he was subjected to harsh conditions, overcrowding, and inadequate food and drink. (Doc. No. 10 at 3-4.) Plaintiff's violation hearing ultimately took place on July 12, 2017, when he was finally released. (Id.) He claims that he was detained for about twenty-nine (29) months because Judge Palumbo, the Court of Common Pleas, the Defender Association, and various other defendants conspired to keep him detained.[6] (Id.)

While incarcerated at the CFCF, Plaintiff filed several grievances that complained of injuries he received and prison conditions. (See Doc. No. 10.) In the Amended Complaint, he groups these grievances into four different categories: (1) mail tampering and denial of access to courts; (2) overcrowding and conditions of confinement; (3) religious deprivation and discrimination; and (4) special dietary and medical deprivation.[7] (Id.)

---

[6] While detained at the CFCF, Plaintiff filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 in the Eastern District of Pennsylvania, challenging his violation of probation arrest and detention. Taylor v. Philadelphia Prison System, Civ. No. 16-2444 (E.D. Pa, filed May 16, 2016). On July 8, 2016, United States Magistrate Judge David R. Strawbridge issued a Report and Recommendation ("R&R"), recommending that the Petition be dismissed. Id. On July 29, 2016, this Court approved and adopted the R&R, and dismissed Plaintiff's Petition. Id. On August 30, 2016, while still at the CFCF, Plaintiff filed a notice of appeal to the United States Court of Appeals for the Third Circuit, requesting a certificate of appealability. Id. The Third Circuit denied his request on December 30, 2016. Id.

[7] In the Amended Complaint, Plaintiff groups his injuries into five categories: (1) his arrest; (2) mail tampering and denial of access to the courts; (3) overcrowding and conditions of confinement; (4) religious deprivation and discrimination; and (5) special dietary and medical deprivation. (Doc. No. 10.) However, as noted here, he only filed grievances in four of these categories. (See id.)

In the mail tampering and denial of access to courts category, Plaintiff claims that the CFCF prevented him from adequately corresponding with this Court and the Court of Appeals for the Third Circuit regarding his § 2241 Petition because prison officials continuously opened and resealed his legal mail before he had the opportunity to read it. (Id. at 5-6.) He contends that he could not verify orders and instructions from the Court because "information [in his mail] was inconsistent and rearranged . . . by prison authorities." (Id. at 5.) He filed four separate grievances with the CFCF regarding this claim and asserts that the prison never remedied the situation. (Id. at 5-6.)

Plaintiff also claims that the CFCF was dangerously overcrowded while he was incarcerated there and that the prison subjected him to "triple celling"—a practice where three or four prisoners are housed in a cell built for two inmates. (Id. at 6-7.) He claims that in lieu of beds or cots, he sometimes had to sleep on a "plastic boat" on the ground. (Id.) According to a grievance filed with the prison, Plaintiff was subjected to triple-celling throughout his nearly two years at the CFCF. (Id. at 27.) What is more, Plaintiff alleges that the overcrowding led to inadequate food, issues with hygiene, and excessive lockdowns. (Id.) He claims that he was sometimes confined to his cell for up to twenty (20) hours a day. (Id. at 6, 27.)

Plaintiff also "put in a grievance for cold air." (Id. at 6.) In the grievance he wrote:

> I am suffering physically from extreme cold air conditioning in the cell and on the housing block. This has been happening for several days. Day and night with no heat only cold air blowing out of air vents. As a result I have to sleep in thermals, sweatshirt and full uniform clothing. Throughout [my] duration in this facility [I] have had to endure cold ventilation conditions.

(Id. at 28.) He notes that these conditions negatively affected his anemia. (Id. at 6.)

Plaintiff also claims that he was subjected to unreasonable strip searches while returning to his cell from the visiting room and other parts of the CFCF. Further, he claims that on June 25,

2017, two prison officials—Sergeant Lebesco and Correctional Officer Smith—"conducted an unreasonable search and assault" on him while he was in his cell and pepper-sprayed him. (Id. at 7.) After the assault, the officers took him to the prison's medical facilities, but Plaintiff claims that the prison medical staff "purposefully" and "deliberately" denied him medical attention for forty-five minutes. (Id.)

In addition, Plaintiff filed five grievances related to "religious deprivation" at the CFCF, claiming that he was denied "free exercise of his religious beliefs, solely because of his Islamic faith." (Id.) He complains that the prison refused to hold Muslim religious services, denied Muslims a space to practice their faith, and blocked all prisoners from praying on the housing block. (Id.) He argues that he was denied these rights while prisoners of other religious faiths were permitted to practice their faiths and given space and time to do so. (Id. at 8.) Additionally, he filed a grievance after prison officials refused to bring "any food or drink whatsoever until 1 to 2 hours after required time to eat and drink" during a period of Islamic religious fasting. (Id.) Plaintiff believes that Warden Gerald May either directed his subordinates to commit these "widespread violations" or that he knew about his subordinates' actions and failed to discipline them. (Id. at 8.)

Finally, Plaintiff filed several grievances complaining about the prison's inattention to his special dietary and medical needs. For example, Plaintiff complained that he needed "vegetarian meals" and nutritious "health shakes" for several health conditions, including anemia, low blood sugar, and thyroid issues, but that the CFCF failed to accommodate him. (Id.) He concedes that at one point the prison granted his requests and provided him with a special dietary accommodation. (Id. at 9.) Additionally, he put in a request for a refill of his asthma inhaler, but claims that the prison delayed granting his request. (Id.) As a result, he claims that he suffered an

asthma attack.  (Id.)  According to the Amended Complaint, Plaintiff believed that he needed "breathing treatment" to address the asthma attack, but the medical staff at the CFCF disagreed and refused this course of treatment.  (Id.)

## III.    STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  After Iqbal, it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).  "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678).  Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully."  Id. (quoting Iqbal, 556 U.S. at 678).  Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (quoting Iqbal, 556 U.S. at 678).

Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Township, 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679).  The inquiry is normally broken into three parts: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory

allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (alteration in original) (citation omitted). The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

Eastern District of Pennsylvania Local Rule 7.1(c) provides that "[u]nless the Court directs otherwise, any party opposing the motion shall serve a brief in opposition . . . within fourteen (14) days after service of the motion and supporting brief. In the absence of timely response, the motion may be granted as uncontested . . . ." E.D. Pa. Local R. 7.1(c). But a motion to dismiss under Rule 12(b)(6) should not be granted "without an analysis of the merits of the underlying complaint, notwithstanding local rules regarding the granting of unopposed motions." Ray v. Reed, 240 Fed. App'x 455, 456 (3d Cir. 2007) (citing Stackhouse v. Mazurkiewicz, 951 F.2d 29, 30 (3d Cir. 1991)).

IV. ANALYSIS

In the present action, Defendants advance several arguments in support of their Motion to Dismiss the Amended Complaint. They first argue that Defendants CFCF and the Philadelphia Sheriff's Office should be dismissed because they are not proper parties to this suit under 42 U.S.C. § 1983. Additionally, they submit that Plaintiff has not stated a Monell claim against the City of

Philadelphia because (1) Plaintiff has failed to show that any constitutionally protected rights had been violated, and (2) Plaintiff has "failed to allege with any specificity either the policies or customs that would impute liability to the City or to identify a municipal policymaker linked to the offending policies." (Id. at 11, 12-15.)   Because Defendants dispute that any constitutional violations occurred, they further argue that all claims should be dismissed against Warden Gerald May, Officer Obrien, and Sgt. Lebesco.

As noted above, Local Rule 7.1 allows a district court to grant a motion as uncontested. But according to the Third Circuit, a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) should not be granted "without an analysis of the merits of the underlying complaint." Ray, 240 Fed. App'x. at 456.   Consequently, the Court will address Defendant's arguments seriatim.

### A.    All Claims Against the Curran-Fromhold Correctional Facility and the Philadelphia Sheriff's Office Will Be Dismissed

As an initial matter, Defendants submit that claims against the Philadelphia Sheriff's Office and the Curran-Fromhold Correctional Facility should be dismissed because, as departments within the City of Philadelphia, they do not have a separate corporate existence and are not proper parties to a lawsuit.  (Doc. No. 14 at 7.)  The Court agrees.

In the Third Circuit, it is well-established that a prison or correctional facility like the CFCF is not a "person" subject to suit under federal civil rights laws.  Keys v. Curran-Fromhold Corr. Facility, No. 14-1757, 2014 WL 2039678, at *1 (E.D. Pa. May 15, 2014); Regan v. Upper Darby Tp., No. 06-1686, 2009 WL 650384, at *4 (E.D. Pa. March 11, 2009) (collecting cases). Essentially, the CFCF is not a separate corporate entity apart from the City of Philadelphia, which is the proper party to a suit under § 1983.  See White v. Green, No. 9-1219, 2009 WL 3209647, at n.1 (E.D. Pa. October 6, 2009) (citing Jenkins v. Del. Cty. Prison, No. 91-7071, 1992 WL 59130,

at *1 (E.D. Pa. March 20, 1992)). Therefore, suing the CFCF is like suing the City of Philadelphia, which has been named as a Defendant in this case.

Similarly, the Philadelphia Sheriff's Office is not a proper party under § 1983. In § 1983 actions, a police department cannot be sued "merely because it is an administrative arm of the local municipality, and is not a separate judicial entity." Butts v. SCI-Camp Hill, No. 08-2259, 2009 WL 222653, at *1 (M.D. Pa. January 29, 2009) (citing DeBellis v. Kulp, 166 F. Supp. 2d 255, 264 (E.D. Pa. 2001)). Hence, for the purposes of § 1983 liability, the Third Circuit has treated a municipality and its police department as a single entity. See Strunk v. East Coventry Tp. Police Dept., 674 Fed. App'x 221, 225 (3d Cir. 2016); Bonenberger v. Plymouth Tp., 132 F.3d 20, 25 n.4 (3d Cir. 1997). Suing the Philadelphia Sheriff's Office is also like suing the City of Philadelphia, which has been named as a Defendant in this case.

Accordingly, neither the CFCF nor the Philadelphia Sheriff's Office are proper parties to this lawsuit and the Court will dismiss all claims against them. That being said, because CFCF and the Philadelphia Sheriff's Department are municipal departments, all allegations made against them will be attributed to the City of Philadelphia.

## B.     Plaintiff Fails to State a **Monell** Claim Against the City of Philadelphia

Plaintiff brings a Monell claim against the City of Philadelphia pursuant to 42 U.S.C § 1983, alleging that the various injuries alleged in the Amended Complaint were a result of the City's policies or customs, or its deliberate indifference to the constitutional rights of its constituents. (Doc. No. 10.)

Section 1983 is a statutory mechanism that allows federal courts to review state and local violations of federal law. In relevant part, the statute provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction

thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

A municipality like the City of Philadelphia is not responsible under § 1983 for the random acts of its employees based on the doctrine of respondeat superior. But as set forth in Monell v. Dep't of Soc. Serv. of City of New York, 436 U.S. 658, 694 (1978), a municipality can be sued when its official policy or custom causes an injury to a plaintiff. To bring a Monell claim, a plaintiff must establish that (1) a constitutionally-protected right has been violated, and (2) the alleged violation resulted from municipal policy, custom, or deliberate indifference. Id. at 694-95; Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990).

As to the second requirement necessary to state a Monell claim, the Third Circuit has explained that a policy is made when a decisionmaker with final authority to establish municipal policy issues an official proclamation, policy, or edict. Wright v. City of Philadelphia, 685 Fed. App'x. 142, 146 (3d Cir. 2017) (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990)). Custom, however, is not specifically endorsed or authorized by law. Id. Rather, custom results from policymakers' "acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity." Id. (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989). Deliberate indifference stems from government inaction, namely the failure to train. Where the plaintiff alleges his injury was caused by a municipality's deliberate indifference, the plaintiff must establish that the city failed to train or supervise city employees on their duty to avoid violating civil rights. City of Canton v. Harris, 489 U.S. 378, 389 (1989). To show the deliberate indifference required for a failure to train claim,

a plaintiff must show "a municipal actor disregarded a known or obvious consequence of his action." Bd. of. Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 410 (1997).

In the present Motion to Dismiss, Defendants submit that Plaintiff has failed to plead a Monell claim against the City of Philadelphia. Specifically, Defendants submit that Plaintiff (1) failed to show that any constitutionally-protected rights had been violated, and (2) "failed to allege with any specificity either the policies or customs that would impute liability to the City or to identify a municipal policymaker linked to the offending policies." (Doc. No. 14 at 12-15.)

For his part, Plaintiff alleges that the City, and its municipal departments, violated his First, Fourth, Eighth, and Fourteenth Amendment rights. (Doc. No. 10 at 10.) As noted previously, he separates his injuries into five distinct categories: (1) his arrest; (2) mail tampering and denial of access to courts; (3) overcrowding and other conditions of confinement; (4) religious deprivation and discrimination; and (5) inadequate medical care resulting from the deprivation of his dietary and medical needs.[8] The Court will address each category in turn and discuss whether Plaintiff

---

[8] Although the Amended Complaint broadly invokes the First, Fourth, Eighth, and Fourteenth Amendments, Plaintiff does not specify which amendments apply to each of his injury categories. In any event, a pro se complaint must be liberally construed and held to a less stringent standard than formal pleadings. Estelle v. Gamble, 429 U.S. 97 (1976). Thus, having examined the allegations, the Court will liberally construe the cited amendments to apply in the following manner:

- Plaintiff's Arrest– Fourth Amendment

- Mail Tampering and Denial of Access to Courts – Fourteenth Amendment

- Conditions of Confinement – Fourth, Eighth, and Fourteenth Amendments

- Religious Deprivation and Discrimination – First and Fourteenth Amendments

- Inadequate medical care – Fourteenth Amendment

has established that (1) a constitutionally-protected right has been violated, and (2) the alleged violation resulted from a municipal policy, custom, or deliberate indifference on the part of an identified policymaker with final decision-making authority.

1.    **Plaintiff Fails to Plead a <u>Monell</u> Claim Regarding the Events of His November 15, 2016 Arrest**

Defendants attack Plaintiff's contention that the circumstances surrounding his November 15, 2016 arrest support a <u>Monell</u> claim. First, they argue that the conclusory allegations contained in the Complaint do not sufficiently establish that he was arrested without cause or that the police officer's search of his person was illegal. Second, they submit that Plaintiff has failed to allege with any specificity either the policies or customs that would impute liability to the City or to identify a municipal policymaker linked to the offending policies. For the reasons discussed below, the Court agrees with the positions of the City of Philadelphia.

a.    **Plaintiff's Allegations Regarding His Arrest, Imprisonment, and the Search and Seizure Do Not Establish a Fourth Amendment Violation**

The Fourth Amendment prohibits arrests without probable cause. <u>See</u> <u>Berg v. Cty. of Allegheny</u>, 219 F.3d 261, 269 (3d Cir. 2000). To establish a claim for false arrest and imprisonment, a plaintiff needs to point to facts that plausibly show that defendants lacked probable cause to believe he had committed the offense for which he was arrested. <u>Godfrey v. Pennsylvania</u>, 525 Fed. App'x. 78, 80 (3d Cir. 2013) (citing <u>Dowling v. City of Philadelphia</u>, 855 F.2d 136, 141 (3d Cir. 1988)). Likewise, to recover money damages for an illegal search and seizure, the plaintiff "must prove, inter alia, that the search and seizure were illegal." <u>Gresh v. Godshall</u>, 170 Fed. App'x. 217, 220 (3d Cir. 2006) (citing <u>Heck v. Humphrey</u>, 512 U.S. 477, 487 n.7 (1994)). A warrantless search is legal if it is supported by probable cause, and probable cause exists when "viewing the totality of the circumstances, 'there is a fair probability that contraband

or evidence of a crime will be found in a particular place.'" Id. at 221 (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

Here, the allegations supporting Plaintiff's false arrest and illegal search and seizure claims can be found in three paragraphs:

> 7. Plaintiff was unconstitutionally falsely arrested, searched, seized, and otherwise false imprisoned by the Philadelphia police department.
>
> 8. On/around November 16, 2015 approximately 10:00 am on the 1-100 block of n.60 street Philadelphia, PA, 19139, plaintiff was unreasonably summoned to stop on the sidewalk by members of the Philadelphia police department. Officer(s) Obrien badge no. 7461 with an accompanying officer. Plaintiff had not violated any laws precipitating this stop.
>
> 9. Plaintiff was then subjected to arrest and unreasonable search and seizure by officers mentioned above without cause. Also his personal property consisting of a bag of hygienics [sic] were seized and never returned.

(Doc. No. 10 at 3) (internal citations omitted).

Plaintiff's conclusory assertions are insufficient to establish a Fourth Amendment violation. While a court at the motion to dismiss stage is required to accept as true all of the allegations in the complaint, it "need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997). To sufficiently establish that Defendants violated his Fourth Amendment rights by falsely arresting him and conducting an illegal search and seizure, Plaintiff needed to point to specific facts that Officer Obrien and the unnamed accompanying police officer lacked probable cause to believe he had committed an offense. Significantly, he does not. Rather, he has only pled sparse, conclusory allegations dressed in legal terminology. He claims that he was "unconstitutionally falsely arrested [and] searched" and that the "arrest and unreasonable search" were "without cause" (Doc. No. 10 at 3), but fails to substantiate his claims with plausible facts.

Consequently, Plaintiff's allegations do not support claims of false arrest and imprisonment, and an illegal search and seizure, all on November 16, 2015.

> **b. Plaintiff Does Not Link His Arrest, Imprisonment, or Search and Seizure Injury to a Policy, Custom, or Deliberate Indifference by a Municipal Policymaker**

Furthermore, Plaintiff's allegations do not establish that his arrest injuries and search and seizure injuries were the result of a City policy or custom, or that they were caused by the City's deliberate indifference to the rights of its constituents. Plaintiff only describes isolated incidents in an attempt to impute liability to the City. But as noted above, Monell prohibits liability based solely on the doctrine of respondeat superior. Monell, 436 U.S. at 694. Thus, without more, the City is not responsible for Plaintiff's injuries stemming from his arrest and the search and seizure.

Equally fatal, Plaintiff fails to identify any municipal policymaker responsible for his injuries. A plaintiff cannot state a Monell claim if he "fails to link the alleged offending policies or customs to anyone within [a municipality] who had policy-making authority." Rees v. Office of Children & Youth, 473 Fed. App'x. 139, 143 (3d Cir. 2012). Here, Plaintiff alleges that Officer Obrien and an unnamed accompanying officer falsely arrested him and subjected him to an unreasonable search and seizure. (Doc. No. 10 at 3.) He does not assert that either individual had "policy-making authority" and does not link the incident to someone who does. Consequently, Plaintiff has failed to state a Monell claim against the City of Philadelphia with respect to his arrest, and the search and seizure on November 16, 2015.

> **2. Plaintiff Fails to State a Monell Claim With Respect to Mail Tampering and Denial of Access to the Court at the CFCF**

Next, Defendants submit that Plaintiff has failed to establish a Monell claim with respect to mail tampering and his access to the courts. First, they assert that Plaintiff has failed to plead a constitutional violation because he suffered no actual injury from the mail tampering. (Doc.

No. 14 at 9-10.)  Second, they again argue that Plaintiff failed to allege with any specificity either the policy or custom that would impute liability to the City or to identify a municipal policymaker linked to the offending policies.  (Id. at 8-9.)  The Court is persuaded by their reasoning.

### a. Plaintiff's Allegations Regarding Mail Tampering and Denial of Access to the Court Do Not Establish a Fourteenth Amendment Violation

To establish a cognizable access to the courts claim under the Fourteenth Amendment, a prisoner must show that the alleged denial of access caused actual injury.  Watson v. Secretary Pennsylvania Dept. of Corr., 567 Fed. App'x. 75, 78 (3d Cir. 2014) (citing Lewis v. Casey, 518 U.S. 343, 352-53 (1996)).  Actual injury occurs when a prisoner demonstrates that a "nonfrivolous" and "arguable" claim was lost because of the denial of access to the courts.  Id.  (citing Christopher v. Harbury, 536 U.S. 403, 415 (2002)).  The plaintiff must "describe the underlying arguable claim well enough to show that it is 'more than mere hope.'"  Monroe v. Beard, 536 F.3d 198, 205-06 (3d Cir. 2008).   The claim must relate to either a direct or collateral challenge to the prisoner's sentence or conditions of confinement, Lewis, 518 U.S. at 355, and the prisoner must establish that no other remedy could compensate for the lost claim.  Monroe, 536 U.S. at 415.

Here, Plaintiff contends that he was "denied [access to the courts] and obstructed by prison officials" who "opened and resealed" his legal mail before he had the opportunity to read it.  (Doc. No. 10 at 5.)  He asserts that this mail tampering prevented him from timely responding to the courts regarding his § 2241 Petition and the subsequent appeal.  Indeed, he claims that "[h]e was on a timely filing schedule" but because of the mail tampering "could not respond to the court which brought an order against him."  (Id.)  Plaintiff also argues that he was "precluded from his right in pursuit of Appeal."  (Id. at 6.)  He concedes, though, that he managed to file a notice of appeal on August 30, 2016.  (Id. at 5.)

Contrary to his assertions, Plaintiff has not alleged a plausible claim that he was denied access to the courts because he has failed to show actual injury. By his own admission, the mail tampering did not prevent him from filing a notice of appeal to the Third Circuit. (Id. at 5.) Furthermore, a review of that appeal shows that Plaintiff was not denied a certificate of appealability because he failed to meet court deadlines; rather, the Third Circuit denied his request because he had not exhausted his state court remedies. Taylor v. Philadelphia Prison System, Civ. No. 16-2444 (E.D. Pa, filed May 16, 2016). For this reason, Plaintiff has not shown that a "nonfrivolous" and "arguable" claim was lost from any mail tampering at the CFCF. Accordingly, Plaintiff has not established that his constitutional rights were violated when CFCF employees opened and resealed his legal mail before he had the opportunity to read it.

**b.      Plaintiff Does Not Link His Mail Tampering or Access to the Courts Injury to a Policy, Custom, or Deliberate Indifference by a Municipal Policymaker**

Even if Plaintiff had demonstrated an actual injury as a result of the prison's mail tampering, the claim fails because he has not established that his injuries were the result of a City policy or custom, or that they were caused by the City's deliberate indifference to the rights of its constituents. Although Plaintiff pleads numerous instances of mail tampering by individual prison employees, he never links these incidents to custom, policy, or a pattern of deliberate indifference. Again, Monell expressly prohibits municipal liability on the basis of respondeat superior. Thus, Plaintiff's failure to attribute the mail tampering to policy, custom, or deliberate indifference on the part of the City is fatal. Furthermore, Plaintiff's mail tampering and access to the courts claim falters because Plaintiff has once again failed to link his injuries to a municipal policymaker. Indeed, he has not identified any individuals that may have tampered with his mail, let alone a municipal policymaker. Accordingly, the Court is persuaded that Plaintiff has not pled a Monell claim against the City with respect to mail tampering and denial of access to the courts.

**3. Plaintiff Fails to State a <u>Monell</u> Claim With Respect to Overcrowding and Conditions of Confinement**

Defendants next submit that Plaintiff has not stated a claim under <u>Monell</u> with respect to overcrowding and conditions of confinement. Again, they claim that Plaintiff (1) has not stated a constitutional violation, and (2) has failed to allege with any specificity either the policies, customs, or deliberate indifference that would impute liability to the City or to identify a municipal policymaker linked to the offending policies. While the Court finds that Plaintiff has indeed pled constitutional violations with respect to certain conditions of confinement injuries, Defendants argument ultimately prevails because Plaintiff has not demonstrated that a municipal policymaker was responsible for or acquiesced in the imposition of policies or customs that injured him.

**a. Plaintiff's Overcrowding and Conditions of Confinement Allegations Establish the First Prong of a <u>Monell</u> Claim**

Defendants submit that Plaintiff has not demonstrated that the conditions of his confinement at the CFCF violated the Eighth or Fourteenth Amendments. (Doc. No. 14 at 10-11.) The Eighth Amendment protects prisoners from cruel and unusual punishment. <u>Allah v. Ricci</u>, 532 Fed. App'x. 48, 50-51 (3d Cir. 2013). But as an initial matter, the Eighth Amendment does not apply until an inmate has been both convicted of and sentenced for the crime at hand. <u>See</u> <u>Bistrian v. Levi</u>, 696 F.3d 352, 367 (3d Cir. 2012). Where, as here, a pretrial detainee challenges his conditions of confinement, the court must consider whether there has been a constitutional

violation under the Fourteenth Amendment.[9]  Hubbard v. Taylor, 538 F.3d 229, 231 (3d Cir. 2008) ("Hubbard II") (citing Bell v. Wolfish, 441 U.S. 520, 535 (1979)).

To establish a constitutional violation based on conditions of confinement under the Fourteenth Amendment, a pretrial detainee must plausibly allege that the conditions amounted to punishment.  See Bell, 441 U.S. at 538.  The Supreme Court has explained:

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment."  Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees.

Id. at 539.  Thus, a condition of confinement is unconstitutional if it is either "the result of an express intent to punish" or "if it is not rationally related to a legitimate government purpose."  Id. at 538-39.  Courts must inquire as to whether the conditions "cause [detainees] to endure [such] genuine privations and hardship over an extended period of time, that the adverse conditions become excessive in relation to the purposes assigned to them."  Hubbard v. Taylor, 399 F. 3d 150, 159-60 (3d Cir. 2005) ("Hubbard I") (internal quotation marks and citations omitted).  The objective component of an unconstitutional punishment analysis evaluates whether "the deprivation [was] sufficiently serious," and the subjective component asks whether "the officials act[ed] with a sufficiently culpable state of mind[.]"  Stevenson v. Carroll, 495 F.3d 62, 68 (3d Cir. 2007) (citing Bell, 441 U.S. at 538-39 n.20), cert. denied, Phelps v. Stevenson, 552 U.S. 1180 (2008).

---

[9]  Here, Plaintiff was arrested for violating his probation.  While detained at the CFCF, he was awaiting his violation of probation hearing in the Philadelphia County Court of Common Pleas and had not yet found to be in violation of his probation.  Thus, he was a pretrial detainee when his alleged injuries occurred.

Within this section, Plaintiff alleges constitutional violations that relate to different conditions of his confinement at the CFCF: (1) overcrowding; (2) cold air; (3) strip searches; and (4) a pepper-spray incident. The Court will address each condition of confinement in turn.

### i. Plaintiff's Claims Regarding Triple-Celling at the CFCF Sufficiently Establish the First Prong of a <u>Monell</u> Claim

Defendants argue that Plaintiff has failed to establish that overcrowding at the CFCF amounts to a constitutional violation under the Eighth or Fourteenth Amendments. (Doc. No. 14 at 9-10.) But having reviewed Plaintiff's factual allegations on this topic, the Court is not persuaded by Defendants' argument.

To evaluate whether triple-celling is rationally related to the government interest of managing an overcrowded prison, a district court must "look to the totality of the conditions" at the prison at issue, "including the size of the detainee's living space, the length of confinement, the amount of time spent in the confined area each day, and the opportunity for exercise." <u>Hubbard II</u>, 538 F.3d at 233.

Here, Plaintiff alleges that due to severe overcrowding at the CFCF, the prison placed three or four prisoners in his cell, even though it was only built to house two inmates. (Doc. No. 10 at 6.) On August 24, 2016, he filed a grievance with the prison, complaining about this practice. The grievance reads as follows:

> . . . since incarceration [I] have been subject to and put in 3 persons to a cell that is only to have 2 persons in it. Have been forced to stay in this overcrowded condition throughout duration of detention[,] being restricted to stay in cell up to 20 hours a day daily without being let out.

(<u>Id.</u> at 27.) Plaintiff claims that the overcrowding led to insufficient food, restricted movement, excessive lockdowns, and limited opportunities to shower and wash, leading to hygiene issues. (<u>Id.</u> at 6.)

In advocating for dismissal, Defendants rely on <u>Wagner v. Algarin</u>, No. 10-2513, 2010 WL 5136110, at *1, 3 (E.D. Pa. Dec. 16, 2010), a case in which the court granted a motion to dismiss an overcrowding claim. There, the incarcerated plaintiff alleged that he was required to sleep in gyms, classrooms, and "3 and 4 man cells with less than 60 [square feet] allowed per person." <u>Id.</u> at *1. In granting the motion to dismiss, the court held, <u>inter alia</u>, that the plaintiff had not alleged any facts that demonstrated that the conditions amounted to punishment. <u>Id.</u> at *3. The court focused on the fact that the plaintiff failed to plead how long he was housed in such cramped conditions. <u>Id.</u>

Defendants assert that Plaintiff "alleged little more than he was placed in a three-man cell . . . [and] had to sleep on a makeshift bed . . ." and that these "deprivations are no greater than those stated in <u>Wagner</u> . . . ." (Doc. No. 14 at 13.) The Court disagrees. First, <u>Wagner</u> did not squarely address triple-celling. In <u>Wagner</u>, there was no allegation that three or four prisoners were housed in a cell built for only two people. The plaintiff only alleged that he did not have enough space. <u>See</u> <u>Wagner</u>, 2010 WL 5136110, at *1. Further, unlike in <u>Wagner</u>, Plaintiff has pled facts showing that he was subjected to triple-celling for the duration of his confinement, which amounted to almost two years. (Doc. No. 10 at 27.) Additionally, he alleges that he was often confined to his cell for twenty hours a day. (<u>Id.</u>) These injuries far exceed those stated in <u>Wagner</u>.

The facts in this case better align with those in <u>Pichalskiy v. Nutter</u>, No. 15-4704, 2016 WL 7018545, at *2 (E.D. Pa. Nov. 30, 2016). There, the court denied a motion to dismiss a Plaintiff's overcrowding claim, stating:

> Pichalskiy's complaint lists several allegations of unsanitary, unsafe, or otherwise inadequate conditions that give a glimpse of the totality of the circumstances that he experienced. For example, he states he was "forced to live in a 7'x10' cell with two other inmates; the cell was originally designed to hold two people, but due to severe overcrowding a third man sleeps on a plastic 'boat' next to the cells toilet and is exposed to urine and fecal matter." He alleges that inmates were subjected to

"nearly contin[uous] lockdowns" and that the "PPS population as a whole has increasingly been subjected to extended periods of 'restricted movement' and 'lockdowns.'" Pichalskiy further claims that there was "inadequate 'day room' and recreational space" and that inmates are denied access to programs and services. The facts alleged, construed liberally and taken as true, give enough detail about the circumstances in the prison to survive a motion to dismiss.

Pichalskiy, 2016 WL 7018545, at *2.

Like those pled in Pichalskiy, Plaintiff's allegations are sufficient to plead a constitutional violation under the Fourteenth Amendment. Taken as true, his allegations regarding the duration of the triple-celling and the amount of time he spent confined to his cell make it plausible that these practices are not rationally related to the legitimate government interest of managing an overcrowded prison.

### ii. Plaintiff's Claims Regarding Cold Air at the CFCF Sufficiently Establish the First Prong of a Monell Claim

Defendants also argue that Plaintiff's cold air allegation does not violate the Fourteenth Amendment. (Doc. No. 14 at 9-10.) Courts have held that detainees have a right to adequate ventilation and to be free from extreme hot and cold temperatures. See, e.g., Alpheaus v. Camden Cty. Corr. Facility, No. 17-0180, 2017 WL 2363001, at *13 (D.N.J. May 31, 2017). But the Constitution does not guarantee a right to be free from all discomfort. Rhodes v. Chapman, 452 U.S. 337, 349 (1981).

Here, Plaintiff alleges that on November 22, 2016, he "put in a grievance for cold air." (Doc. No. 10 at 6.) In the grievance, he wrote:

I am suffering physically from extreme cold air conditioning in the cell and on the housing block. This has been happening for several days. Day and night with no heat only cold air blowing out of air vents. As a result I have to sleep in thermals, sweatshirt and full uniform clothing. Throughout [my] duration in this facility [I] have had to endure cold ventilation conditions.

(Id. at 28.) According to the Complaint, the cold air severely impacted Plaintiff's anemia. (Id. at 6.)

In their Motion to Dismiss, Defendants rely on <u>Gardener v. Lanigan</u>, No. 13-7064, 2013 WL 6669230, at *3 (D.N.J. Dec. 18. 2013), a case in which the court found that forcing a prisoner to sleep on a cold floor did not rise to the level of a constitutional violation. Defendants' reliance is misguided. For one, in <u>Gardener</u>, the court analyzed the prisoner's conditions of confinement claim under the Eighth Amendment, and not the Fourteenth. <u>Id.</u> What is more, <u>Gardener</u> addressed a situation that is factually distinguishable from the case at hand.

Other decisions provide better guidance on Plaintiff's cold air conditions of confinement claim. For example, in <u>David v. Yates</u>, the court found that a detainee's cold air claim stated a constitutional violation under the Fourteenth Amendment. No. 15-6943, 2016 WL 5508809, at *7 (D.N.J. Sept. 27, 2016). The court reasoned as follows:

> Plaintiffs allege that their cells were "ice cold" and that once the ventilation system was shut down, twenty degree temperature air was permitted to blow directly into the housing unit. When blankets were distributed, Grohs's wool allergy was not accommodated, and Davis was not provided additional blankets at all. Both plaintiffs allege that the cold temperature caused them to shiver uncontrollably for hours and deprived them of sleep. These allegations sufficiently state a conditions-of-confinement claim under the Fourteenth Amendment.

<u>Id.</u> Compare <u>Yates</u> with <u>Stokelin v. A.C.J.F. Warden</u>, No. 17-3484, 2018 WL 4357482, at *4 (D.N.J. Sept. 13, 2018), where the court analyzed a ventilation claim and came to the opposite conclusion. There, the court found:

> In the instant complaint, Plaintiff fails to allege any facts aside from his assertions that the ventilation system is "outdated" and "no good." Plaintiff does not indicate that the ventilation system is not functioning. Plaintiff does not contend that the temperature is too hot or too cold within the prison. Nor does Plaintiff claim that he is suffering from discomfort or any health problem as a result of the ventilation system. There are no facts put forth that even indicate there is a lack of ventilation, let alone a sufficiently serious problem. Without more, Plaintiff's claim fails to provide sufficient facts to state a claim under either the Eighth or Fourteenth Amendment.

<u>Id.</u>

In the instant case, Defendants claim that Plaintiff "alleged little more than that . . . he was cold." (Doc. No. 14 at 13.) But this assessment completely ignores the substance of Plaintiff's November 22, 2016 grievance, which is attached to the Amended Complaint. In the grievance, he complains that he has difficulty sleeping and needs to wear several layers to stay warm. (Doc. No. 10 at 28.) Further, he alleges that the cold negatively affected his anemia. (Id. at 6.) These allegations align with those alleged in Yates. Thus, the Court finds that it is plausible that the cold air and lack of heat amount to punishment, and that they do not rationally relate to any legitimate government purpose.

### iii. Plaintiff's Allegations Regarding Strip Searches at the CFCF Do Not Establish a Fourth or Fourteenth Amendment Violation

Although Plaintiff complains of strip searches in the conditions of confinement section of the Amended Complaint (Doc. No. 10 at 6-7), Defendants do not address these allegations in their Motion to Dismiss. In any event, the Court has independently reviewed Plaintiff's strip search allegations and is not persuaded that these allegations violate the Constitution.

The strip search of a pretrial detainee may form the basis of a § 1983 claim through the Fourth or Fourteenth Amendments. To raise a Fourth Amendment claim, the detainee must allege that the strip search was unreasonable. See Payton v. Vaughn, 798 F. Supp. 258, 261-62 (E.D. Pa. 1992). Because prisons have a legitimate government interest in maintaining safety and keeping contraband out of prisons, strip searches do not violate the Fourth Amendment where officials conduct searches in a reasonable manner to maintain security and to prevent the introduction of contraband or weapons in the facility. Florence v. Bd. of Chosen Freeholders of Cty. of Burlington, 621 F.3d 296, 309-11 (3d Cir. 2010); Millhouse v. Arbasak, 373 Fed. App'x. 135, 137 (3d Cir. 2010) (holding that routinely strip-searching inmates when entering and exiting their cells does not violate the Constitution where the search is reasonable).

Inmates do not have a right to be free of strip searches.  Bell, 441 U.S. at 558.  Even allegations that a strip search was degrading or embarrassing fail to state a constitutional violation. Moreover, courts have found that strip searches in the presence of other inmates are not unreasonable in light of time constraints and safety concerns.  See DeFilippo v. Vaughn, No. 95-909, 1996 WL 355336, at *2 (E.D. Pa. June 24, 1996).  Further, strip searches can be conducted without probable cause provided they are conducted in a reasonable manner.  Ostrander v. Horn, 145 F. Supp. 2d 614, 620 (M.D. Pa. 2001) (citing Bell, 441 U.S. at 52).

In this case, Plaintiff has not sufficiently pled that the strip searches at the CFCF amounted to Fourth Amendment violations.  He claims that he was routinely searched when "going and coming from visits or any services in the facility."  (Doc. No. 10 at 29.)  But it is not unreasonable for staff to check for contraband via visual body cavity searches when a prisoner moves through restricted areas of a correctional facility or returns from seeing visitors.  See Small v. Wetzel, 528 F. App'x 202, 207 (3d Cir. 2013) (citing Florence, 566 U.S. at 328); Millhouse, 373 Fed. App'x. at 137.

Significantly, "there is no Fourth Amendment violation if a plaintiff cannot show that the strip search [was] conducted in an unreasonable manner."  Barber v. Jones, No. 12-2578, 2013 WL 211251, at *8 (D.N.J. Jan. 18, 2013).  While Plaintiff has claimed that these strip searches were "unreasonable," he has not pled facts sufficient to support that claim.  The mere fact that he was strip searched in front of other inmates is not unreasonable considering the legitimate government concerns relating to maintaining safety, protecting officers, and keeping contraband out of prisons. His allegations in no way show that prison officials moved beyond the scope of what was reasonable.  Compare McMillan v. Hughes, No. 17-13435, 2018 WL 3945467, at *6 (D.N.J. Aug. 16, 2018) (finding a strip search unreasonable where the prison officials conducted the search in

front of others, made degrading comments about his body, and threatened his safety during the search). Consequently, the Court is not persuaded that Plaintiff's strip search allegations state a constitution violation under the Fourth Amendment.

Turning to his due process argument, Plaintiff has not stated a claim under the Fourteenth Amendment. First, there is a legitimate prison safety objective for conducting routine strip searches. "Ensuring security and order at the institution is a permissible and nonpunitive objective, whether the facility houses pretrial detainees, convicted inmates, or both." Bell, 441 U.S at 561. Second, routine strip searches are reasonably related to a prison's legitimate safety goals. In Bell, the Court held that the routine strip searches did not violate due process because there was no evidence that they were excessive responses to legitimate security needs such that they rose to the level of punishment. Id. As noted above, the objective component of the unconstitutional punishment analysis evaluates whether "the deprivation [was] sufficiently serious" and the subjective component asks whether "the officials act[ed] with a sufficiently culpable state of mind[.]" Stevenson, 495 F.3d at 68 (citing Bell, 441 U.S. at 538-39 n.20).

Analyzing the objective factors, there are no facts showing that the manner or duration of Plaintiff's strip searches extended beyond a routine safety search and thus cannot be considered "sufficiently serious" intrusions. Although Plaintiff complains about the frequency of the searches and the fact that they were conducted in front of other inmates, the allegations in the Complaint do not set forth any circumstances that indicate that these strip searches were arbitrary or excessive punishments. He has not pled that they were unrelated to legitimate safety concerns.

Looking to the subjective factors, Plaintiff has not pled any facts to show a culpable state of mind by any members of the CFCF staff. There are no allegations that the searches were meant to punish him or that they were conducted in an unreasonably abusive manner in violation of

Plaintiff's due process rights.  See DeFillipo, 1996 WL 355336, at *3 ("Here, plaintiff does not allege that the [strip] search was conducted for an illegitimate or unjustified purpose, nor does he allege that [the correctional officer] executed the search in an inappropriate or abusive manner.").

Therefore, even accepting Plaintiff's allegations as true and construing them liberally, Plaintiff has not shown any facts in the Amended Complaint to support his claim that the strip searches were punitive in nature.  For that reason, he has not pled a violation of the Fourteenth Amendment with respect to his strip search claims.

### iv.    Plaintiff's Claims Regarding the Pepper Spray Incident at CFCF Do Not Establish a Fourteenth Amendment Violation

Finally, Defendants argue that Plaintiff has failed to plead a constitutional violation with respect to the pepper spray incident that took place June 25, 2017.  (Doc. No. 14 at 13.)  They contend that the claim fails because the one paragraph allegation "was again conclusory [and] provided no factual context to suggest the use of force was not necessary . . . ."  (Id.)

Excessive force claims brought under the Fourteenth and Eighth Amendments are analyzed under the same standard.  This type of claim "includes both an objective component, whether the deprivation of a basic human need is sufficiently serious, and a subjective component, whether the officials acted with a sufficiently culpable state of mind."  Gay v. Stevens, No. 10-6354, 2011 WL 5276535, at *4 (D.N.J. Nov. 2, 2011) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  The objective component turns on context and corresponds to "contemporary standards of decency."  Id. (citing Hudson v. McMillian, 503 U.S. 1, 8 (1992)).  The crux of the subjective component is the principle that "only the unnecessary and wanton infliction of pain implicates" the Constitution.  Id. (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)).

When evaluating the subjective component of an excessive use of force claim, a district court must determine "whether force was applied in a good faith effort to maintain or restore

discipline or maliciously and sadistically for the very purpose of causing harm." <u>Whitley v. Albers</u>, 475 U.S. 312, 320-21 (1986). To determine whether force was used in "good faith" or "maliciously and sadistically," the district court should examine several factors:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by prison officials; and (5) any efforts made to temper the severity of a forceful response.

<u>Gay</u>, 2011 WL 5276535, at *5 (quoting <u>Brooks v. Kyler</u>, 204 F.3d 102, 106 (3d Cir. 2000)).

Accordingly, not all use of force is "excessive" and rises to the level of a constitutional violation.

<u>Id.</u>

In paragraph 43 of the Amended Complaint, Plaintiff alleges an excessive force claim under the Eighth or Fourteenth Amendment:

> On/around July 7, 2017 Plaintiff put in grievance for incident that occurred on June 25, 2017[.] On/around 9:45 pm c/o officer[] Sgt. Lebesco and c/o A. Smith conducted an unreasonable search and assault on Plaintiff/Petitioner in his cell[.] [F]ollowing the strip search c/o A. Smith at the directive of Sgt. Lebesco discharged his weapon at Plaintiff of chemical spray into his facial and eyes without provocation; [h]e was kept in restraint for approximately 45 minutes in this state while suffering injury . . . ."

(Doc. No. 10 at 6.)

On the subject of the use of pepper spray in prisons, the Third Circuit Court of Appeals has held the following:

> [the] use of tear gas is not "a per se violation of the Eighth Amendment...." <u>Soto v. Dickey</u>, 744 F.2d 1260, 1270 (7th Cir. 1984). Rather, "[t]he use of mace, tear gas or other chemical agent of the like nature when reasonably necessary to prevent riots or escape or to subdue recalcitrant prisoners does not constitute cruel and inhuman punishment." <u>Soto v. Dickey</u>, 744 F.2d 1260, 1270 (7th Cir. 1984). <u>See also</u> <u>Michenfelder v. Sumner</u>, 860 F.2d 328, 336 (9th Cir. 1988) (policy allowing use of taser guns on inmate who refused to submit to a strip search does not constitute cruel and unusual punishment); <u>Spain v. Procunier</u>, 600 F.2d 189, 195 (9th Cir. 1979) (the use of tear gas "in small amounts may be a necessary prison technique if a prisoner refuses after adequate warning to move from a cell or upon other

provocation presenting a reasonable possibility that slight force will be required."); Clemmons v. Greggs, 509 F.2d 1338, 1340 (5th Cir. 1975) (the use of tear gas when reasonably necessary to subdue recalcitrant prisoners does not violate the Eighth Amendment).

Passmore v. Ianello, 528 Fed. App'x. 144, 147-48 (3d Cir. 2013).

In Gay, a case similar to the one at hand, the court granted a motion to dismiss an excessive force claim where the plaintiff failed to sufficiently allege malicious or sadistic force. Gay, 2011 WL 5276535, at *4. There, the plaintiff claimed that, unprovoked, one officer sprayed him in the eye with pepper spray, another officer hit him in the eye, and yet another officer "pushed his thumb in the same eye that [the first officer] had sprayed pepper spray into." Id. But the court determined that these allegations were not enough to plead the subjective component of an excessive force claim. Id. The court explained its finding, writing "[Plaintiff] has failed to allege any facts that would demonstrate that the force was excessive under the circumstances or that the force was applied maliciously and sadistically, as opposed to in a good faith effort to restore order. The mere assertion that force was used against a prisoner is not sufficient to state a claim for an Eighth Amendment violation." Id.

Compare the allegations pled in Gay to those pled in Mueller v. Centre County, where the court found that the plaintiff sufficiently pled a plausible excessive force claim:

> I was violently extricated from cell # 6 in block A-1 by C.E.R.T. Team at C.C.C.F. on 8-4-09. For no reason other than retribution for my complaint to State Police about incident on 7-25-09. I did not disobey any orders. I did not refuse to cuff up to exit cell. I did not resist. But I was still rushed by C.E.R.T. Team wearing gas masks & helmets. I was pinned against wall between cell 5 & 6 and held there to breathe tear gas and pepper spray causing me much pain a[nd] burning in my eyes, throat and lungs. They pointed paintball gun & TASER gun at me. Then put me back in cell # 6 and pinned me to the floor and cut my clothes off and left me naked, coughing, sneezing, choking & vomiting from tear gas. My requests for medical assistance were ignored, until difficulty breathing and back spams [spasms] from fractured vertib[r]ae from incident # 1 caused me to pass out. Deputy Hite and McClellan ordered cell extraction. Capt. Perryman supervised. Lt. Ananea filmed

incident. Lt. Stine led C.E.R.T. Team and held TASER. C.O. Peters had paintball gun.

No. 09-1880, 2009 WL 4912305, at (M.D. Pa. Nov. 23, 2009).

Having compared the above-cited cases to the facts alleged in the Amended Complaint, the Court is persuaded that Plaintiff's threadbare pepper spray allegations are more factually analogous to those pled in Gay than those pled in Mueller. Although Plaintiff claims that the use of force was "unreasonable" and "without cause," he does not point to facts to substantiate his claims. Without more, merely claiming that something is unreasonable does not make it so. Further, Plaintiff has not demonstrated through factual allegations that the use of pepper spray was malicious or sadistic. Thus, the Court is persuaded that the pepper spray allegations do not state a constitutional violation.

### b. Plaintiff Fails to Sufficiently Link His Conditions of Confinement Injuries to a Policy, Custom, of Deliberate Indifference by a Municipal Policymaker

As noted above, to plead a Monell claim against a municipality, a plaintiff must sufficiently establish that an alleged constitutional violation was the result of municipal policy, custom, or deliberate indifference. Here, Plaintiff does not explicitly state whether the triple-celling or cold air were prison policy or custom, or the result of the prison's deliberate indifference to prisoners' needs. While other courts within the Circuit have held that triple-celling amounts to a prison policy, Plaintiff has not alleged that the practice was wide-spread or that other prisoners were affected. See, e.g., Burgos v. City of Philadelphia, 270 F. Supp. 3d 788, 796 (3d Cir. 2017) (where plaintiffs explicitly stated that the City maintained a prison-wide policy of triple-celling); Lopez v. City of Philadelphia, No. 13-6571, 2017 WL 2869495 (E.D. Pa. July 5, 2017) (same).

In any event, Plaintiff's conditions of confinement claim fails because he has not sufficiently linked any alleged policies or customs to a municipal policymaker. Within this section,

he mentions Warden Gerald May, claiming that he was the "custodian" of the CFCF while Plaintiff

was detained there.  But this singular factual averment is not enough.  For the purposes of § 1983,

a municipal policymaker is an individual who possesses "final, unreviewable discretion to make a

decision or take an action."  Andrews v. City of Philadelphia, 895 F.2d 1469, 1481 (3d Cir. 1990).

"[I]t is incumbent upon [a plaintiff] to show that a policymaker is responsible either for the policy

or, through acquiescence, for the custom."  Id. at 1480.  Plaintiff has not done so by merely stating

that Warden May was the "custodian."

In Peele v. Delaney, No. 12-4877, 2017 WL 467347, at *3-4 (E.D. Pa. Feb. 3, 2017), the

court denied the defendants' motion to dismiss a § 1983 claim based on overcrowding where the

plaintiff sufficiently pled that the warden of the prison was responsible for the policy at issue.

There, the court wrote:

> Plaintiff provides more than just boilerplate allegations to establish the defendant's
> actual knowledge. Plaintiff specifically alleges that every day at CFCF, multiple
> times per day, the guards take a count of the number of inmates in the cells. (Id.)
> This tally is then reported from the guards, up the chain of command to the sergeant,
> then to the lieutenant/shift commander, and finally to the deputy or Warden
> Delaney. (Id.) These facts support a plausible claim that defendant had actual
> knowledge of and acquiesced in the triple (and sometimes quadruple) celling. See
> Chavarriaga v. N.J. Dep't Corr., 806 F.3d 210, 222 (3d Cir. 2015) ("A plaintiff
> makes sufficient allegations of a defendant's personal involvement by describing
> the defendant's participation in or actual knowledge of and acquiescence in the
> wrongful conduct.").

(Id. at *3.)  Similarly, in Burgos, the court found that the plaintiff had sufficiently pled a Monell

claim where he pointed to facts that the policymakers inspected cells and were required to sign off

on conditions.  270 F. Supp. 3d at 796.

Here, Plaintiff's singular allegation stands in stark contrast to those found to be sufficient

in Peele and Burgos.  Aside from being the "custodian" at the CFCF while Plaintiff was detained,

there are no other allegations showing that Warden May had any connection whatsoever to the

incidents alleged in the conditions of confinement section of the Amended Complaint. Thus, for the reasons stated here, Plaintiff has failed to state a <u>Monell</u> claim against the City of Philadelphia under § 1983 for injuries arising from his conditions of confinement at the CFCF.

### 4. Plaintiff Has Failed to State a <u>Monell</u> Claim With Respect to His Religious Deprivation and Discrimination Allegations

Next, Defendants argue that Plaintiff has failed to plead a <u>Monell</u> claim with respect to his injuries arising from religious deprivation and discrimination at the CFCF. First, they contend that his allegations do not amount to First or Fourteenth Amendment violations. (Doc. No. 14 at 11.) Second, they again submit that Plaintiff has failed to allege any policy, custom, or deliberate indifference or sufficiently identify a municipal policymaker so as to impute liability to the City. For the reasons discussed below, the Court finds that Plaintiff has alleged a First and Fourteenth Amendment violation regarding his right to assemble and practice his religion, but that he has failed to plead the involvement of a municipal policymaker. For this reason, his <u>Monell</u> claim will be dismissed.

### a. Plaintiff's Religious Deprivation and Discrimination Claims Sufficiently Establish the First Prong of a <u>Monell</u> Claim

First, Defendants contend that Plaintiff's religious deprivation and discrimination allegations do not state a constitutional violation. Plaintiff alleges two sets of incidents: first, he claims that during a period of religious fasting, prison officials failed to deliver his meals on time, and second, he claims that throughout his detention, he was prevented from praying while other religions were not. The Court will discuss each incident in turn.

### i. The Prison's Delay in Delivering Plaintiff His Meals During Periods of Religious Fasting Does Not Violate the First Amendment

Here, Plaintiff alleges that while he was fasting during daylight hours for Islamic holy days, prison employees at the CFCF failed to bring him "any food or drink whatsoever until 1 to 2 hours

after required time to eat and drink." (Doc. No. 10 at 7.)   On the subject of a detainee's First

Amendment right to the free exercise of religion, the Third Circuit has stated the following:

> Inmates have a First Amendment right to the free exercise of their religions, but
> imprisonment necessarily results in some restrictions on the practice of religion.
> O'Lone v. Shabazz, 482 U.S. 342, 348–49, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).
> Limits on the free exercise of religion arise from valid penological objectives,
> including deterrence of crime, rehabilitation of prisoners, and institutional security.
> See id. at 348, 107 S.Ct. 2400. Under the First Amendment, regulations or policies
> that infringe upon an inmate's right to religious freedom need only pass a
> reasonableness test. Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d
> 64 (1987).

Ford v. Bureau of Prisons, 570 Fed. App'x. 246, 249 (3d Cir. 2014).   "The threshold question in

any First Amendment . . . case is whether the prison's challenged policy or practice has

substantially burdened the practice of the inmate-plaintiff's religion."   See Robinson v.

Superintendent Houtzdale SCI (3d Cir. 2017) (per curiam) (citing Washington v. Klem, 497 F.3d

272, 277-78 (3d Cir. 2007)).   "'When a prison regulation impinges on inmates' constitutional

rights, the regulation is valid if it is reasonably related to legitimate penological interests.'"

Garraway v. Lappin, 490 Fed. App'x. 440, 445 (3d Cir. 2012) (quoting Turner v. Safely, 482 U.S.

78, 89 (1978)).

Additionally, prisons must accommodate an inmate's sincerely held religious belief

regarding a need for a particular diet.  Ford, 570 Fed. App'x. at 249 (citing DeHart v. Horn, 227

F.3d 47, 52 (3d Cir. 2000)).  If a religious belief is sincerely held, the district court must then

evaluate the reasonableness of any regulations restricting or impinging upon that religious belief.

This involves weighing the following four factors:

> first, whether the regulation bears a "valid, rational connection" to a legitimate and
> neutral governmental objective; second, whether prisoners have alternative ways of
> exercising the circumscribed right; third, whether accommodating the right would
> have a deleterious impact on other inmates, guards, and the allocation of prison
> resources generally; and fourth, whether alternatives exist that "fully

accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests."

Sutton v. Rasheed, 323 F.3d 236, 252 (3d Cir. 2003).

Advocating for dismissal, Defendants rely on Ford v. Bureau of Prisons, where the Third Circuit Court of Appeals affirmed the dismissal of a First Amendment religious deprivation claim. (Doc. No. 14 at 11-12.)  In Ford, a Muslim inmate sued the prison where he was housed because on two occasions "the [prison] failed to provide him with a meal after he fasted from sunrise to sundown on two Holy Days . . . ." 570 Fed. App'x. at 248. There, the court held that the prison's failure to provide meals on two occasions did not amount to an unreasonable or substantial burden on the plaintiff's religious rights.

Here, Plaintiff's allegations do not rise to the level of those found to be insufficient in Ford. Plaintiff merely complains that his meals were delayed after his religious fasting, not that he was completely denied food or drink.  (Doc. No. 10 at 7-8.)  This delay does not amount to an unreasonable or substantial burden on the practice of his religion.  Thus, this set of allegations does not state a First Amendment violation.

ii.      **Plaintiff's Claims that the CFCF Prevented Him from Practicing Islam Establish the First Prong of a Monell Claim**

Plaintiff also submits that prison employees prevented him from practicing his religion at the CFCF.  He alleges that members of other religious faiths were given preferential treatment. While detained, he filed several grievances to that effect.  His allegations implicate the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

For their part, Defendants argue that this set of allegations fails because Plaintiff has not stated "specific instances, times, places, or individuals involved . . . ."  (Doc. No. 14 at 14.)  See also Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) ("The Third Circuit has held that a civil

rights complaint is adequate where it states the conduct, time, place, and persons responsible.")
But this argument completely ignores Plaintiff's factual averments. Within the attached grievances,
Plaintiff clearly pleads the conduct that occurred, when the conduct occurred, and where it
occurred.  On June 3, 2016, Plaintiff filed the following grievance:

> Currently ongoing—[t]here is no provided area for me to make my daily religious
> prayers, which is afforded to all those in institution of religious status everyday
> throughout the day.  There is also barring and non-allowance of praying on the
> housing block, which is clearly against institutional policy.

(Doc. No. 10 at 33.)  On March 3, 2017, Plaintiff complained of the following:

> Religious Friday service which is to be held weekly did not take place.  The belief
> and exercise of my religious faith have [sic] been denied me.  Even for period of
> up to (two) 2 months without taking place.  There is [sic] also no daily provisions
> made or allowed for my everyday prayers of assembly. There is no provided . . .
> access to a minister of my religion.  Other religions in institution have this and are
> provided religious prayers and service area which they attend leaving . . . the
> housing area for up to (3) three times a day.

(Id. at 36.)  While not artfully pleaded, Plaintiff, proceeding pro se, has pled the time, conduct, and
place of his allegations with appropriate specificity.

Having examined these allegations, the Court is persuaded that Plaintiff's factual
allegations not only pass muster under Iqbal and Twombly, but also state a plausible First
Amendment violation.  As noted above, the key inquiry for a First Amendment claim is whether
the regulation or practice substantially burdens the practice of religion.  In this case, Plaintiff's
allegations go far and above the "substantial burden" standard.  Indeed, he asserts that he has been
totally barred from practicing his Islamic faith at the CFCF.  Taking his allegations as true, he has
pled a First Amendment violation.

Turning to whether these allegations violate the Equal Protection Clause, a plaintiff
bringing an equal protection claim must allege that he was treated differently than other similarly
situated inmates, and that this different treatment was the result of intentional discrimination based

on his membership in a protected class, such as religious affiliation. Hassan v. City of New York, 804 F.3d 277, 295 (3d Cir. 2015) (citing Washington v. Davis, 426 U.S. 229 (1976)). A successful equal protection claim requires the plaintiff to sufficiently allege discriminatory purpose by showing that the defendant took the challenged action "at least partially because the action would benefit or burden an identifiable group." Doe ex rel. Doe v. Lower Merion Sch. Dist., 665 F.3d 524, 548 (3d Cir. 2011).

Here, Plaintiff alleges that as a Muslim, he was afforded treatment different from similarly situated prisoners who were members of other religions. Taking as true Plaintiff's allegations that other religions were permitted to practice their religions but Plaintiff, a Muslim, was not, it is plausible that these allegations amount to intentional discrimination based on religion under the Equal Protection Clause.

> **b.** **Plaintiff Has Failed to Link His Alleged Religious Deprivation and Discrimination Injuries to a Policy, Custom, or Deliberate Indifference by a Municipal Policymaker**

Second, Defendants argue that even if Plaintiff's allegations stated a constitutional violation, he has failed to sufficiently plead a policy, custom, or deliberate indifference or properly identify a municipal policymaker with final decision-making authority. Construed liberally, it appears that Plaintiff attempts to plead that his religious deprivation injuries were the result of a policy or custom. He alleges the following:

> 53. The warden has causal connection by history of widespread violations putting warden on notice of the need to correct the deprivation and he failed to do so. The Practice "Custom or Policy" of the warden resulted in violating the constitutional rights of Plaintiff.

> 54. Supporting inference that the warden directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

(Doc. No. 10 at 8.)  Essentially, he contends that Warden Gerald May, who was warden of the CFCF while Plaintiff was detained there, had a "[c]ustom or [p]olicy" of ignoring prisoners' religious rights and that he failed to train or supervise his subordinates on how not to violate prisoners' First Amendment rights.  It is unclear from the pleadings whether every prisoner of Islamic faith was prevented from worshipping or whether Plaintiff was the only individual affected.

Viewed alone, these two paragraphs do not sufficiently state a policy or custom.  They appear to be nothing more than formulaic recitations of law.  But examined within the context of the rest of the religious deprivation allegations at set forth above and construed liberally, Plaintiff has sufficiently pled that the CFCF either had a policy or custom that disallowed Muslims from practicing their faiths.  The allegations in the Amended Complaint give rise to the inference that these incidents stemmed from "an official proclamation, policy, or edict" or "acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure.'"

Where Plaintiff falters is the sufficiency of his allegations of Warden May's personal involvement.  As noted above, a plaintiff cannot establish a Monell claim if he "fails to link the alleged offending policies or customs to anyone within [a municipality] who had policy-making authority."  Rees v. Office of Children & Youth, 473 Fed. App'x. 139, 143 (3d Cir. 2012).  For the purposes of § 1983, a municipal policymaker is an individual who possesses "final, unreviewable discretion to make a decision or take an action."  Andrews v. City of Philadelphia, 895 F.2d 1469, 1481 (3d Cir. 1990).  As a threshold matter, "it is incumbent upon [a plaintiff] to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom."  Id. at 1480.

In the present action, Plaintiff has not made this showing. Plaintiff claims that "the warden directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." This singular averment is a far cry from demonstrating with facts that Warden May was responsible for the policy or acquiesced to it. It is nothing more than a legal conclusion, which is not entitled to the assumption of truth. Only one allegation possibly links Warden May to this policy or custom—the fact that Plaintiff submitted several religious deprivation grievances. But under Third Circuit precedent, merely receiving grievances is generally insufficient to establish the knowledge needed to plead a <u>Monell</u> claim. <u>Sutton v. City of Philadelphia</u>, 21 F. Supp. 3d 474, 486 (E.D. Pa. May 20, 2014) (citing <u>Rode</u>, 845 F.2d at 1208). Moreover, the Amended Complaint is devoid of any allegations that Warden May is the final decisionmaker for CFCF prison policy and custom. Thus, without more, Plaintiff has failed to plead a <u>Monell</u> claim against the City of Philadelphia with respect to religious deprivation and discrimination because he has not sufficiently linked the policy or custom causing his injuries to a municipal policymaker with final decision-making authority

**5.      Plaintiff Has Failed to State a <u>Monell</u> Claim With Respect to His Inadequate Medical Care Allegations**

Finally, Defendants submit that Plaintiff has failed to establish a <u>Monell</u> claim with respect to any deprivation of his special dietary or medical needs. First, they argue that he has not pled a constitutional violation. (Doc. No. 14 at 12-13.) Second, they once again assert that Plaintiff has failed to allege with any specificity either the policies, customs, or deliberate indifference that would impute liability to the City or to identify a municipal policymaker linked to the offending policies. (<u>Id.</u> at 8-9.)

a. **Plaintiff's Inadequate Medical Care Allegations Fail to Establish a Fourteenth Amendment Violation**

Defendants argue that Plaintiff's inadequate medical care claim fails under the Eighth Amendment. (Doc. No. 14 at 14-15.) As an initial matter, Plaintiff's claim falls under the Fourteenth Amendment, and not the Eighth, because Plaintiff was a pretrial detainee at the time of his injuries. In any event, Defendants' failure to cite to the Fourteenth Amendment in their Motion to Dismiss is harmless because the United States Supreme Court has held that the Fourteenth Amendment "affords pretrial detainees protections 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'" Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 581 (3d Cir. 2003) (quoting City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983)). Accordingly, in previous cases, the Third Circuit has applied Eighth Amendment case law to evaluate whether a claim for inadequate medical care by a pretrial detainee is sufficiently plausible under the Fourteenth Amendment. See, e.g., Lenhart v. Pennsylvania, 528 Fed. App'x. 111, 115 (3d Cir. 2013).

To state a claim for inadequate medical care under the Eighth or Fourteenth Amendments, a plaintiff must establish a deliberate indifference to a serious medical condition. See Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). The standard set forth in Estelle has two prongs: (1) the prisoner's medical needs must be serious, and (2) deliberate indifference on the part of prison officials. Id. A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth Cty. Corr. Institutional Inmates v. Lanzaro, 834 F.3d 326, 347 (3d Cir. 1987) (internal quotations marks and citations omitted). Additionally, a serious medical condition is one for which the denial of treatment causes "unnecessary and wanton infliction of pain" or permanent disability or loss. Id.

Deliberate indifference requires that a defendant "knows of and disregards an excessive risk to an inmate's health or safety." Dominguez v. Governor of Pennsylvania, 574 Fed. App'x. 63, 65 (3d Cir. 2014). The prison official "must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and draw the inference." Natale, 318 F.3d at 582. However, "[n]either a prisoner's subjective dissatisfaction with the care provided nor his disagreement with medical staff's professional judgment is . . . sufficient to establish deliberate indifference." Davis. v. Jail, No. 15-8154, 2016 Wl 676374, at *3 (D.N.J. Feb. 18, 2016) (citing Hairston v. Dir. Bureau of Prisons, 563 Fed. App'x. 893, 895 (3d Cir. 2014)).

In this case, Plaintiff's inadequate medical care claim includes three sets of injuries. First, he claims that he became lightheaded and lost weight due to the prison's denial of "health shakes" and "vegetarian meals" apparently prescribed for his low blood sugar, thyroid issues, and anemia. (Doc. No. 10 at 8.) Second, he contends that the prison neglected to refill his asthma inhaler and as a result he suffered an asthma attack. (Id. at 9.) When experiencing the asthma attack, he claims that the prison refused him necessary breathing treatment. (Id.) Third, he claims that after he was pepper-sprayed by Sgt. Lebesco, the prison made him wait 45 minutes in handcuffs before treating him. (Id.) For their part, Defendants submit that Plaintiff's inadequate medical claim fails because he has not shown that prison officials were deliberately indifferent to his medical needs. (Doc. No. 14 at 12-13.) The Court agrees.

Whether or not his injuries amount to serious medical needs, those claims fail because Plaintiff has not demonstrated deliberate indifference under Estelle. Regarding his claimed injuries stemming from his dietary needs, Plaintiff's own pleadings demonstrate that the prison did not "disregard an excessive risk to [his] health or safety." Indeed, after Plaintiff filed

grievances, he concedes that the prison attempted to comply with his nutritional plan. (Doc. No. 10 at 9.)

With regard to the inhaler incident, Plaintiff's own allegations again show that the prison lacked deliberate indifference. Although he was not allowed an inhaler when he was first detained, the prison eventually granted his request. (Id.) That his inhaler was not filled on time does not amount to a "culpable state of mind" or show that the prison officials' actions constituted anything more than mere negligence. The "inadvertent failure" to provide medical care cannot be said to be "an unnecessary or wanton infliction of pain." Estelle, 429 U.S. at 105. Plaintiff further objects to the medical staff's decision that he did not require "breathing treatment" after his asthma attack. But deliberate indifference cannot be based on mere difference of medical opinion. See Joh v. Suhey, 709 Fed. App'x. 729, 731 (3d Cir. 2017). With respect to medical decisions, "prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993). A federal court will "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment." Inmates of Allegheny Cty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979). That Plaintiff did not agree with the medical staff's decision is not enough to show deliberate indifference. Further, he does not allege that the medical staff's decisions were wrong or incorrect. Without having a medical degree, he simply asserts that he needed a certain treatment that was not provided. This is not enough to satisfy Estelle.

On the subject of the pepper spray incident, Plaintiff only alleges that the prison "refused treatment" for forty-five (45) minutes. (Doc. No. 10 at 9.) He does not state whether the prison officials completely failed to treat him. In Joh, the Third Circuit held that a nurse's delay in treating a broken finger for over an hour did not amount to deliberate indifference. Joh, 709 Fed. App'x.

at 731. Again, disagreement with a medical professional's legitimate opinion or decision cannot form the basis of deliberate indifference under <u>Estelle</u>. <u>See id.</u> And while Plaintiff alleges that the medical staff "purposefully" and "deliberately" delayed his care, he does not allege any facts to support this contention. Accordingly, the Court is persuaded that Plaintiff has not pled medical care claims that amount to constitutional violations.

### b. Plaintiff Fails to Allege that His Inadequate Medical Care Injuries Were the Result of a Policy, Custom, or Deliberate Indifference by a Municipal Policymaker

In any event, Plaintiff's inadequate medical care claim fails because he has not pled any facts linking his injuries to a City policy or custom or to the City's deliberate indifference. He only pleads isolated incidents committed by individual prison employees and tries to impute liability to the entire City. <u>Monell</u> prohibits this kind of pleading. Even if Plaintiff did point to some policy, custom, or deliberate indifference, he names no municipal policymaker with final decision-making authority. In fact, the inadequate medical care section of the Amended Complaint does not contain a single name or identity of any specific individual involved in Plaintiff's injuries. Thus, Plaintiff's inadequate medical care claims fail because he has not pled constitutional violations and because he has failed to allege a policy, custom, or deliberate indifference by any City policymaker.

### C. Plaintiff Fails to State a Claim under § 1983 Against Warden Gerald May

Defendants also argue that Plaintiff fails to state a claim against Warden Gerald May under § 1983. They submit that Plaintiff has not established that Warden May was personally involved in any constitutional violations or that he is responsible on the basis of supervisory liability. (Doc. No. 14 at 9-10.) The Court agrees.

State officials are not subject to liability under § 1983 when sued in their official capacities because the suit is essentially against the state itself. <u>Will v. Mich. Dept. of State Police</u>, 491 U.S.

58, 71 (1989). State officials can, however, be held responsible for actions taken in their individual capacities in two situations. First, a plaintiff can establish liability by showing that the state official was personally involved in the alleged constitutional deprivation. Second, a plaintiff can demonstrate liability by showing that the state official was acting in a supervisory capacity. Parratt v. Taylor, 451 U.S. 527, 537 n.3 (1981); Baker v. Monroe Twp., 50 F.3d 1186, 1190 (3d Cir. 1995).

Supervisory liability can be pled in two ways. A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004). First, "personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Argueta v. U.S. Immigration and Customs Enforcement, 643 F.3d 60, 72 (3d Cir. 2011) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)). This can be established "by showing a supervisor tolerated past or ongoing misbehavior." Id. (quoting Baker, 50 F.3d at 1191 n.3). To plead acquiescence, "the supervisor must contemporaneously know of the violation of a plaintiff's rights and fail to take action." Anderson v. City of Philadelphia, Civ. A. No. 16-5717, 2017 WL 550587, at *4 (E.D. Pa. Feb. 10, 2017) (citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1294 (3d Cir. 1997)). Significantly, "[a]llegations of 'actual knowledge and acquiescence . . . must be made with appropriate particularity.'" Id. (omission in original) (quoting Rode, 845 F.2d at 1207). And "[a]lthough a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive." Chavarriaga v. N.J. Dep't of Corr., 806 F.3d 210, 222 (3d Cir. 2015) (citing Baker, 50 F.3d at 1194).

Second, a supervisor can be liable under § 1983 if he "implements a policy or practice that creates an unreasonable risk of a constitutional violation on the part of the subordinate and the supervisor's failure to change the policy or employ corrective practices is a cause of this

unconstitutional conduct." Argueta, 643 F.3d at 72 (citing Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001)). Claims of failure to train or supervise are "generally considered a subcategory of policy or practice liability." Barkes v. First Corr. Med., Inc., 766 F.3d 307, 316 (3d Cir. 2014), rev'd on other grounds sub. nom, Taylor v. Barkes, 135 S. Ct. 2042 (2015) (per curiam). To be held liable on a claim of failure to supervise:

> The plaintiff must identify a supervisory policy or practice that the supervisor failed to employ, and then prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure.

Id. at 317 (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989)). "[I]t is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did." Brown, 269 F.3d at 216 (quoting Sample, 885 F.2d at 1118). Instead, "the plaintiff must identify specific acts or omissions of the supervisor that evidence deliberate indifference and persuade the court that there is a 'relationship between the identified deficiency and the ultimate injury.'" Id. (quoting Sample, 885 F.2d at 1118).

As noted above, Plaintiff only mentions Warden May in reference to his conditions of confinement injuries and his religious deprivation injuries. In the conditions of confinement section, Plaintiff only asserts that Warden May was the "custodian" of the CFCF while he was detained there. (Doc. No. 10 at 6.) In the religious deprivation section, he alleges the following:

> 53. The warden has causal connection by history of widespread violations putting warden on notice of the need to correct the deprivation and he failed to do so. The Practice "Custom or Policy" of the warden resulted in violating the constitutional rights of Plaintiff.

> 54. Supporting inference that the warden directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

(Id. at 8.)  He makes no allegations that Warden May was involved in any of his other injuries.

In this case, Plaintiff has not pled facts showing that Warden May was personally involved in the alleged religious deprivation or the overcrowding.  In the conditions of confinement section, Plaintiff merely mentions that Warden May was the "custodian" of the CFCF, but does not allege any personal involvement.  (See id. at 6.)  Likewise, in the religious deprivation section, Plaintiff concludes that Warden May knew of the "widespread violations" but failed to remedy the situation.  (Id. at 8.)  But this allegation is nothing more than a legal conclusion, which is not entitled to the assumption of truth.  See Argueta, 643 F.3d at 74 (explaining that the court must identify "those allegations that, because they are no more than conclusions, are not entitled to any assumption of truth").

Furthermore, Plaintiff fails to state a claim against Warden May through supervisory liability.  First, the Complaint fails to include sufficient facts showing that Warden May either directed, or knew of and acquiesced in, the conduct that took place.  Instead, the Amended Complaint is chock-full of legal conclusions couched as factual allegations.  Plaintiff broadly contends that Warden May "directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so," but makes no attempt to substantiate that contention with facts.  (See Doc. No. 10 at 8.)  Nor does he plead facts that show Warden May tolerated past or ongoing misbehavior.

Second, Plaintiff has failed to sufficiently plead a policy or custom that Warden May implemented that created a risk of constitutional violations.  As noted supra, Plaintiff has not plausibly alleged that the "[c]ustom or [p]olicy" cited in paragraph 53 of the Amended Complaint caused any constitutional violations, let alone that it even existed.  Thus, because Plaintiff has pled no factual conduct at all on the part of Warden May, and because Warden May cannot be held

liable for the random acts of others through <u>respondeat</u> <u>superior</u>, Plaintiff's claims against Warden May will be dismissed.

**D.      Plaintiff Fails to State a Claim under § 1983 Against Officer Obrien**

Defendants also submit that Plaintiff fails to state a claim against Officer Obrien under § 1983.  They argue that neither the arrest nor the search and seizure amounted to constitutional violations, and thus, Officer Obrien cannot be held liable for any alleged injuries.  (Doc. No. 14 at 5-7.)  They further add that Plaintiff has not sufficiently pled Officer Obrien's role in the arrest and the search and seizure under the auspices of <u>Iqbal</u> and <u>Twombly</u>.  (<u>Id.</u>)  For the reasons that follow, the Court agrees.

As noted above, the Fourth Amendment prohibits arrests without probable cause.  <u>See</u> <u>Berg</u>, 219 F.3d at 269.  To establish a claim for false arrest and imprisonment, a plaintiff needs to point to facts that plausibly show that defendants lacked probable cause to believe he had committed the offense for which he was arrested.  <u>Godfrey</u>, 525 Fed. App'x. at 80 (citing <u>Dowling</u>, 855 F.2d at 141).  Likewise, to recover money damages for an illegal search and seizure, the plaintiff "must prove, <u>inter alia</u>, that the search and seizure were illegal."  <u>Gresh</u>, 170 Fed. App'x. at 220 (citing <u>Heck</u>, 512 U.S. at 487 n.7).  A warrantless search is legal if it is supported by probable cause, and probable cause exists when "viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  <u>Id.</u> at 221 (quoting <u>Gates</u>, 462 U.S. at 238.)

Here, though, Plaintiff only pleads conclusory allegations peppered with legal buzzwords. He claims that he was "unreasonably summoned" and subject to "arrest and unreasonable search and seizure" without pointing to facts that show how and why those incidents were in fact unreasonable.  (Doc. No. 10 at 3.)  Even viewing the allegations of the Amended Complaint liberally, the circumstances of his arrest are unclear.  Equally unclear is the role Officer Obrien

played in his "unreasonable" arrest and search and seizure. In paragraph 8 of the Amended Complaint, Plaintiff states that two Philadelphia police officers stopped him on the day in question: Officer Obrien and "an accompanying officer." (Id.) In paragraph 9, he writes that he was subject to "arrest and unreasonable search and seizure by officers mentioned above without cause." (Id.) Those are the only references to Officer Obrien in the Amended Complaint. As Defendants emphasize, these threadbare references are not enough. Plaintiff does not make clear which officer arrested him or which officer searched his person. He does not explain why the officers' conduct was problematic. Applying the principles of Twombly and Iqbal as noted supra, Plaintiff does not sufficiently allege a Fourth Amendment violation against Officer Obrien. Even construing the allegations in the light most favorable to Plaintiff, the facts do not establish a constitutional violation. As a result, the Court will dismiss the § 1983 claim against Officer Obrien.

### E.    Plaintiff Fails to State a § 1983 Claim Against Sergeant Lebesco

Although Defendants ask the Court to dismiss Plaintiff's claims as to Sgt. Lebesco, the Motion does not explicitly advance any arguments on his behalf. (See Doc. No. 14.) In fact, Sgt. Lebesco's name is mentioned only once, within Defendants' argument that Plaintiff failed to plead a constitutional violation with respect to his conditions of confinement. They write:

> Plaintiff did allege under his "Conditions of Confinement" heading that a correctional officer, A. Smith, discharged pepper spray at Plaintiff. But this one paragraph allegation was again conclusory, provided no factual context to suggest the use of force was unreasonable, and did not allege that Sgt. Lebesco, or any other named Defendant, was the individual who pepper-sprayed Plaintiff. For these reasons, Plaintiff's Fourteenth and/or Eighth Amendment claims concerning the conditions of his confinement should be dismissed.

(Doc. No. 14 at 13.) In any event, because the pepper spray incident does not amount to a constitutional violation under the Eighth or Fourteenth Amendment, Sgt. Lebesco cannot be held liable for it under § 1983.

**F.      All State Law Claims Will Be Dismissed Pursuant to 28 U.S.C. § 1367**

Plaintiff also brings several state law claims against Defendants. (See Doc. No. 10 at 11.) Under 28 U.S.C. § 1367(c)(3), a district court is permitted to dismiss supplemental state law claims if all of the federal claims over which it has original jurisdiction have been dismissed.  See 28 U.S.C. § 1367(c)(3); see also Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000) ("[w]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative jurisdiction for doing so").  Because the Court will grant Defendants' Motion to Dismiss Plaintiff's § 1983 claims, it will decline to exercise supplemental jurisdiction over his pendant state law claims pursuant to § 1367(c)(3).  Accordingly, Plaintiff's state claims will be dismissed without prejudice to his ability to refile in state court.

## V.      CONCLUSION

For the foregoing reasons, Defendants' uncontested Motion to Dismiss Plaintiff's Amended Complaint for Failure to State a Claim (Doc. No. 10) will be granted in its entirety.  An appropriate Order follows.